## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| JANA R. ROSENKRANZ, JOAN MONDRY and RAMONA DRISCOLL, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | **CIVIL ACTION NO.**: 3:20-cv-00168 |
| v. | ) ) ) | **AMENDED CLASS ACTION COMPLAINT** |
| ALTRU HEALTH SYSTEM, THE ALTRU HEALTH SYSTEM RETIREMENT COMMITTEE, and JOHN DOES 1-20. | ) ) ) ) | |
| Defendants. | ) ) ) ) | |

Plaintiffs, Jana R. Rosenkranz, Joan Mondry and Ramona Driscoll ("Plaintiffs"), by and through their attorneys, on behalf of the Altru Health System Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Altru Health System ("Altru" or "Company") and the Altru Health System Retirement Committee and its members during the Class Period[2] for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] Defined below as September 9, 2014 through the date of judgment.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  29 U.S.C. § 1104(a)(1)(B).  These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees,"* *supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b).[3]

6.      Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.      Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.      At all times during the Class Period (September 9, 2014 through the date of judgment) the Plan had at least $230 million dollars in assets under management.  At the end of 2017 and 2018, the Plan had over $329 million dollars and $358 million dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a large plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a large plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached

the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories.

12.     In many instances, Defendants failed to utilize the lowest cost share class for many of the mutual funds within the Plan, and failed to consider certain collective trusts available during the Class Period as alternatives to the mutual funds in the Plan, despite their lower fees and materially similar investment objectives.

13.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

14.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

18.     Plaintiff, Jana R. Rosenkranz ("Rosenkranz"), resides in Fargo, North Dakota. During her employment, Plaintiff Rosenkranz participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff, Joan Mondry ("Mondry"), resides in Fargo, North Dakota. During her employment, Plaintiff Mondry participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Plaintiff, Ramona Driscoll ("Driscoll"), resides in Eatonton, Georgia. During her employment, Plaintiff Driscoll participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

21.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

22.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available

alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

### Company Defendant

23.     Altru is the Plan sponsor and a named fiduciary with a principal place of business being 1200 South Columbia Road, Grand Forks, North Dakota, 58201. The December 31, 2018 Form 5500 of Altru Health System filed with the United States Department of Labor ("2018 Form 5500") at 1.

24.     Altru describes itself as "a community of 3,800 health professionals and support staff" that has been in business for more than 100 years.  It serves "over 200,000 residents in northeast North Dakota and northwest Minnesota."[4] Altru is a not-for profit corporation.[5]

25.     The Company established and appointed the members of the Altru Health System Retirement Committee (hereinafter, "Retirement Committee" or "Committee"). As detailed in the Defined Contribution Investment Policy – 401(k) effective January 28, 2018 ("IPS"), Altru Health System is "responsible for … [a]ppointing the members of the Investment and Retirement Committees." IPS at 4.  As part of its responsibilities, the Committee is responsible for selecting and monitoring the performance of the funds available for investment in the Plan. *Id.*

---

[4] https://www.altru.org/about-us/who-we-are/ accessed on September 4, 2020.

[5] https://www.altru.org/app/files/public/18699/2019-Community-Report.pdf

26.     Altru also made discretionary decisions about whether to make discretionary matching contributions to the Plan each year. As detailed in the Plan's governing document: "Matching Contribution means a Matching Contribution which the Employer in its sole discretion elects to make to the Plan." The Defined Contribution Volume Submitter Plan and Trust of the of the Altru Health System Retirement Savings Plan as Amended and Restated effective January 1, 2017 ("Plan Doc.") at 9.

27.     The Company also acted through its officers, including the Committee and its members, to perform Plan-related fiduciary functions in the course and scope of their employment.

28.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**<u>Committee Defendants</u>**

29.      As defined in the IPS, the "'Investment Committee' shall refer to the governing board established to direct the administration and investment management of Plan assets." IPS at 2.

30.     The Committee is the fiduciary responsible for selecting and monitoring the performance of the funds available for investment in the Plan. IPS at 3.  However, as detailed below, the Committee failed to prudently carry out its fiduciary duties.

31.     The Committee is also, in theory, responsible for monitoring and reviewing all services and costs associated with the Management of the Plan. IPS at 13. As will be detailed below, the Committee fell well short of prudently exercising these fiduciary goals.

32.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

33.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

34.     To the extent that there are additional officers, employees and/are contractors of Altru who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 11-20 include, but are not limited to, Altru officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.     CLASS ACTION ALLEGATIONS

35.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 9, 2014 through the date of judgment (the "Class Period").

36.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 filed with the Dept. of Labor lists 4,359 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at p. 2.

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

37.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan.  Defendants treated Plaintiffs consistently with other Class members, and managed the Plan as a single entity.  Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

    A.     Whether Defendants are fiduciaries of the Plan;

    B.     Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    C.     Whether the Company Defendant failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

    D.     The proper form of equitable and injunctive relief; and

    E.     The proper measure of monetary relief.

39.     Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

40.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

42.     The Summary Plan Description describes the purpose of the Plan as providing: "protection for you and your family at retirement or death or if you become permanently disabled." SPD at 1. The Plan was originally established on January 1, 1985. The Adoption Agreement incorporated into the Plan Doc. at 2. The Plan has been amended several times since that time with the most recent amendment being effective January 1, 2017. *Id.*

43.     The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *See,* the

December 31, 2018 Report of the Auditor of the Altru Health System Retirement Savings Plan ("2018 Auditor Report") at 5-6.

*Eligibility*

44.     In general, regular full-time employees are eligible to participate in the Plan who have reached the age of 21 and have completed one month of service.  SPD at 2.

*Contributions*

45.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  2018 Auditor Report at 5.

46.     With regard to employee contributions, "Each year, participants may contribute up to 100 percent of annual compensation, as defined by the Plan, subject to Internal Revenue Code (IRC) limitations." SPD at 5.

47.      With regard to matching contributions made by Altru, Altru "matches 50 percent of the first six percent of participant elective deferrals each pay period." *Id*. As detailed above, Altru may also, in its discretion, make nonelective contributions to the Plan. *Id.* As detailed in the 2018 Auditor Report: "Discretionary nonelective contributions totaled $1,550,586 and $1,686,001 for the years ended December 31, 2018 and 2017, respectively." *Id.*

48.     Like other companies that sponsor 401(k) plans for their employees, Altru enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

49.     Altru also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See*, https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

50.     Given the size of the Plan, Altru likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

51.     With regard to contributions made by the employees, the 2018 Auditor Report states that "Participants are immediately 100 percent vested in their contributions … ." 2018 Auditor Report at 6. However, with regard to matching contributions made by Altru, participants are subject to a vesting schedule. *Id.* As described in the 2018 Auditor Report: "[a] participant is 100% vested after six years of credited service." *Id.*

### *The Plan's Investments*

52.     In theory, the Committee is responsible for prudently selecting and monitoring the performance of the funds available for investment in the Plan. However, in practice, throughout the Class Period, the Committee has continually failed to prudently execute these fiduciary duties.

53.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee.  IPS at 10.

54.     In 2018, the Plan had over $350 million  dollars in assets under management across all funds in the Plan. 2018 Auditor Report at 5. As of December 31, 2018, the Plan's assets were valued at $329,411,143. *Id.*

### *Payment of Plan Expenses*

55.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the SPD: "expenses charged to the Plan may be charged pro rata to each Participant in relation to the size of each Participant's account balance or may be charged equally to each Participant." SPD at 5.

## VI.     THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

56.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

57.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

58.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in the selection (and maintenance) of several funds in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### A.  Defendants Lacked a Prudent Fiduciary Process to Evaluate the Plan's Fees

59.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their

ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [7]

60.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

61.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

62.     Investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

---

[7] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

63.    "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

64.    Fiduciaries "should develop and follow a deliberative process for evaluating the reasonableness of fees.  This includes understanding the sources, amounts, and nature of recordkeeping and investment management fees paid by the plan.  Under DOL fee disclosure regulation, [fiduciaries] should be sure they receive service and fee information from each covered service provider, and they should diligently review this information as part of the reasonableness evaluation process."  *Id.*

65.    "[Fiduciaries] must understand the content of the fee disclosure materials received from service providers.  If the disclosure is not clear, or if the plan sponsor believes the information is incomplete, they must request additional information or clarification.  Additionally, the plan sponsor may have an obligation to inquire as to the availability of lower-cost investment alternatives, such as lower-cost share classes for mutual funds or the availability of collective trusts."  Best Practices for Plan Fiduciaries," at 36.

66.    For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans).  This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.  However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.  Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

67.     According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports."  "Best Practices for Plan Fiduciaries," at 37.

68.     "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process.  For a fee, consultants can give plan sponsors a third-party perspective on quality and costs of services.  It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context.  By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison."  *Id.*

69.     When conducting fiduciary reviews of the plan's investment menu, plan fiduciaries should document the relevant information gathered and considered for purposes of the investment review, as well as supporting evidence for any decision to continue or change investment options. *See* "Best Practices for Plan Fiduciaries," at 36 ("Plan sponsors should build a record to document the information and factors used to determine the reasonableness of plan fees.")

70.     Documentation of fiduciary reviews is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions.  Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized.  Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

71.     Plaintiffs have reviewed the Committee's meeting minutes from 2019.  Plaintiffs were not provided and do not have access to meeting minutes from prior years, but review of the meeting minutes they have obtained demonstrate plausibly that the Committee did not employ a prudent process in monitoring Plan investments.

72.     Importantly, the Committee did not document any effort to give adequate attention to the high investment management fees charged by several of the Plan's investments, especially those managed by JPMorgan.  The investment management fees charged by JPMorgan for these funds were excessive in relation to comparable or nearly-identical alternatives. Materials reviewed at the Committee meetings focused primarily (and generally) on fund performance and provided little information about the investment management fees being charged by the Plan's investments. The Committee did not meaningfully review the investment management fees charged for the Plan's investments as indicated by the absence of discussions in meeting minutes about these fees, their benchmarks or the source for the benchmarks.

73.     There is also no documentation to indicate the Committee investigated whether the actively managed mutual funds in the Plan's investment lineup provided sufficiently greater benefits over available index fund alternatives to offset the higher costs of the actively managed funds.  Nor is there evidence that the Committee ever conducted a Plan-wide comparison of the Plan's actively managed mutual funds with alternative index funds that were available to the Plan. The Committee's failure to meaningfully consider replacing the Plan's actively managed mutual fund options resulted in Plan participants paying much higher investment fees than was necessary.

74.     Also, to the extent the Committee chose and/or failed to remove higher cost shares of investment funds, the meeting minutes do not document the reasoning for doing so.

75.     Based on reasonable inferences from these facts, as well as others set forth below, during the Class Period, Defendants failed to have a proper system of review in place to ensure

that participants in the Plan were being charged appropriate and reasonable fees for the Plan's investment options.

76.     In sum, Defendants failed to leverage the size of the Plan to negotiate for (1) lower expense ratios for certain investment options maintained and/or added to the Plan during the Class Period; and (2) a prudent payment arrangement with regard to the Plan's recordkeeping and administrative fees.

> **B.     The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner**
>
> > **(1) Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans**

77.     One indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (plans having between $100 million dollars and $250 million in assets).

78.     In 2018, for example, the expense ratios for many of the funds in the Plan in some cases had a difference of *65%* (in the case of Nuveen Real Estate Securities I) and a difference of *44%* (in the case of Invesco Oppenheimer Developing Markets Y) above the median expense ratios in the same category.[9] The chart below illustrates these excessive expense ratios for each applicable fund in the Plan:

| Fund Option | ER[10] | Category | ICI Median |
|---|---|---|---|
| JNSAX<br>JPMorgan SmartRetirement 2025 A | 0.85 % | Target-date | 0.61% |
| JTTAX<br>JPMorgan SmartRetirement 2020 A | 0.81 % | Target-date | 0.61% |

---

[9] *See*  BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plans, 2016* at 62 (June 2019) (hereafter, "ICI Study") available at https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf.

[10]  The listed expense figures are taken from summary prospectuses published in 2020.

| Fund Option | ER[10] | Category | ICI Median |
|---|---|---|---|
| SRJAX<br>JPMorgan SmartRetirement 2035 A | 0.87 % | Target-date | 0.61% |
| JSMAX<br>JPMorgan SmartRetirement 2030 A | 0.86 % | Target-date | 0.61% |
| SMTAX<br>JPMorgan SmartRetirement 2040 A | 0.88 % | Target-date | 0.61% |
| JSAAX<br>JPMorgan SmartRetirement 2045 A | 0.88 % | Target-date | 0.61% |
| JTSAX<br>JPMorgan SmartRetirement 2050 A | 0.88 % | Target-date | 0.61% |
| JFFAX<br>JPMorgan SmartRetirement 2055 A | 0.88 % | Target-date | 0.61% |
| FUNYX<br>Pioneer Fundamental Growth Y | 0.77 % | Domestic Equity | 0.52% |
| JSRAX<br>JPMorgan SmartRetirement Income A | 0.73 % | Target-date | 0.61% |
| RPMGX<br>T. Rowe Price Mid-Cap Growth | 0.75 % | Domestic Equity | 0.52% |
| FARCX<br>Nuveen Real Estate Securities I | 1.02 % | Domestic Equity | 0.52% |
| ODVYX<br>Invesco Oppenheimer Developing Markets Y | 1.00 % | Int'l Equity | 0.64% |

79.     The above comparisons understate the excessiveness of fees in the Plan throughout the Class Period.  That is because the ICI Median fee is based on a study conducted in 2016 when expense ratios would have been higher than 2019 or even today given the downward trend of expense ratios the last few years.  Indeed, the ICI median expense ratio for domestic equity funds for plans with between $100 million dollars and $250 million dollars in assets was 0.61% using 2015 data compared with 0.52% in 2016.  Accordingly, the median expense ratios in 2020, or for that matter 2019, utilized by similar plans would be lower than indicated above, demonstrating a greater disparity between the 2019 expense ratios utilized in the above chart for the Plan's funds and the median expense ratios in the same category.

80.     Although a good gauge of Defendants' imprudence, median-based comparisons understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available that offered lower expenses than the median.

### (2) Several of the Plan's Funds Were Not in the Lowest Fee Share Class Available to the Plan

81.     Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

82.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors.  There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble*, 2017 WL 3523737, at * 13.

83.     Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets.  Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, 960 F.3d 478, 483 (8th Cir. May 22, 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans").

84.     Throughout the Class Period, the Plan offered JPMorgan Target date funds.  These target date funds had expense ratios ranging from 0.85% to 0.88% in 2019 (these expense ratios would have been higher in 2014). However, since November of 2014, JPMorgan offered the R6 share versions of the same funds which were identical in all respects except for price.

20

85.     As demonstrated by the chart below, Defendants' failure to select the R6 share class was an indication of their failure to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds.  The chart below uses 2020 expense ratios to demonstrate how much more expensive the funds were than their identical counterparts:

| Current Fund | ER | Lower Share Class | ER | Excess Expense |
|---|---|---|---|---|
| JNSAX<br>JPMorgan SmartRetirement 2025 A | 0.85% | JNSYX<br>JPMorgan SmartRetirement 2025 R6 | 0.45% | 89% |
| JTTAX<br>JPMorgan SmartRetirement 2020 A | 0.81 % | JTTYX<br>JPMorgan SmartRetirement 2020 R6 | 0.44 % | 84% |
| SRJAX<br>JPMorgan SmartRetirement 2035 A | 0.87 % | SRJYX<br>JPMorgan SmartRetirement 2035 R6 | 0.46 % | 89% |
| JSMAX<br>JPMorgan SmartRetirement 2030 A | 0.86 % | JSMYX<br>JPMorgan SmartRetirement 2030 R6 | 0.46 % | 87% |
| SMTAX<br>JPMorgan SmartRetirement 2040 A | 0.88 % | SMTYX<br>JPMorgan SmartRetirement 2040 R6 | 0.47 % | 87% |
| JSAAX<br>JPMorgan SmartRetirement 2045 A | 0.88 % | JSAYX<br>JPMorgan SmartRetirement 2045 R6 | 0.47 % | 87% |
| JTSAX<br>JPMorgan SmartRetirement 2050 A | 0.88 % | JTSYX<br>JPMorgan SmartRetirement 2050 R6 | 0.47 % | 87% |
| JFFAX<br>JPMorgan SmartRetirement 2055 A | 0.88 % | JFFYX<br>JPMorgan SmartRetirement 2055 R6 | 0.47 % | 87% |

86.     In addition to the target dates funds discussed above, Altru also failed to identify identical lower share classes for other funds in the Plan as detailed in the chart, below:

| Current Fund | ER | Lower Share Class | ER | Excess Exp. | Date Available |
|---|---|---|---|---|---|
| FUNYX Pioneer Fundamental Growth Y | 0.77 % | PFGKX Pioneer Fundamental Growth K | 0.66 % | 17% | Dec. 20 2012 |
| JSRAX JPMorgan SmartRetirement Income A | 0.73 % | JSIYX JPMorgan SmartRetirement Income R6 | 0.42 % | 74% | Nov. 3 2014 |
| RPMGX T. Rowe Price Mid-Cap Growth | 0.75 % | RPTIX T. Rowe Price Mid-Cap Growth I | 0.62 % | 21% | Aug 28 2015 |
| FARCX Nuveen Real Estate Securities I | 1.02 % | FREGX Nuveen Real Estate Securities R6 | 0.88 % | 16% | April 30 2013 |
| ODVYX Invesco Oppenheimer Developing Markets Y | 1.00% | ODVIX Invesco Oppenheimer Developing Markets R6 | 0.83% | 20% | Dec. 29 2011 |

87.     During the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

88.     The following is a sampling of the assets under management as of the end of 2018:

| Current Fund | 2018 Assets Under Management |
|---|---|
| JNSAX<br>JPMorgan SmartRetirement 2020 A through 2055 A[11] | $147,881,641 |
| FUNYX<br>Pioneer Fundamental Growth Y | $12,484,480 |
| JSRAX<br>JPMorgan SmartRetirement Income A | $10,288,216 |
| RPMGX<br>T. Rowe Price Mid-Cap Growth | $7,099,226 |
| FARCX<br>Nuveen Real Estate Securities I | $4,231,342 |
| ODVYX Invesco Oppenheimer Developing Markets Y | $1,453,477 |

89.     All of the lower share class alternatives were available during the Class Period.  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into the lower share classes at the earliest opportunity.

90.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

---

[11] Target date funds are negotiated and sold as a package. The minimum buy in amount, if any, for target date funds is based on the amount under management for all target date funds in any given Plan.

91.     In other words, given the size of the Plan, Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduced the likelihood that Plan participants would achieve their preferred lifestyle in retirement.

92.     By failing to investigate the use of lower cost share classes, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### (3) Defendants Failed to Investigate Availability of Lower Cost Collective Trusts

93.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts (also referred to as CITs), which pool plan participants' investments further and provide lower fee alternatives to even institutional shares of mutual funds.[12]

94.     Indeed, fiduciary best practices requires that fiduciaries inquire as to the availability of lower-cost investment alternatives like collective trusts.  "Best Practices for Plan Fiduciaries," at 36.  The use of collective trusts is also endorsed under trust law from which ERISA is derived. *Tibble*, 135 S. Ct. at 1828.  Trust law states to determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more

---

[12] Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses. As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

**suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1) (emphasis added).

95.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to timely identify and select available collective trusts.[13]  A prudent fiduciary conducting an impartial review of the Plan's investments would have identified all funds that could be converted to collective trusts at the earliest opportunity.

96.     Beginning in 2016, JPMorgan offered collective trust versions of its target date funds, which, as of 2020, had no minimum investment amount. Given the fact that the Plan had over $106 million dollars invested in target date funds in 2016, the Plan would have easily qualified for the collective trust versions beginning in 2016 given that there is no current minimum. Target date funds are sold as a package with the minimum investment amount referring to the total amount invested across all target date funds. In 2018, for example, the Plan had eight JPMorgan target date funds ranging from an expected retirement date of 2020 to 2055 at five-year intervals. A minimum needed to qualify refers to the total of all assets held in all of the 8 funds collectively. Looking at

---

[13] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online.  *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter CITs Gaining Ground).  Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Use of CITs in DC Plans Booming; CITs Gaining Ground.*  And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the Plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act.  Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

2018, the Plan had over $147 million dollars invested in JPMorgan target date funds. The chart below illustrates the cost difference between the JPMorgan target date funds and the collective trust versions:

| Current Fund Option | ER | Collective Trust Version | ER | Excess Exp. |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 A | 0.85 % | JPMorgan SmartRetirement 2025 CF | 0.44% | 93% |
| JPMorgan SmartRetirement 2020 A | 0.81 % | JPMorgan SmartRetirement 2020 CF | 0.44% | 84% |
| JPMorgan SmartRetirement 2035 A | 0.87 % | JPMorgan SmartRetirement 2035 CF | 0.44% | 97% |
| JPMorgan SmartRetirement 2030 A | 0.86 % | JPMorgan SmartRetirement 2030 CF | 0.44% | 95% |
| JPMorgan SmartRetirement 2040 A | 0.88 % | JPMorgan SmartRetirement 2040 CF | 0.44% | 100% |
| JPMorgan SmartRetirement 2045 A | 0.88 % | JPMorgan SmartRetirement 2045 CF | 0.44% | 100% |
| JPMorgan SmartRetirement 2050 A | 0.88 % | JPMorgan SmartRetirement 2050 CF | 0.44% | 100% |
| JPMorgan SmartRetirement 2055 A | 0.88 % | JPMorgan SmartRetirement 2055 CF | 0.44% | 100% |

97.     Accordingly, collective trusts were readily available to the Plan during the Class Period, which Defendants knew or should have known of their existence, and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments beginning in 2016. This is especially the case since the Plan maintained at least one collective trust in the Plan throughout the Class Period.

98.     The Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of collective trusts in the same investment style of mutual funds in the Plan.

Because of the Plan's size, it could have reaped considerable cost savings by using collective trusts, but Defendants again failed to investigate this option adequately.

99.      In summary, Defendants could have used the Plan's bargaining power to obtain high-quality, low-cost alternatives to mutual funds, in order to negotiate the best possible price for the Plan.  By failing to investigate the use of alternative investments such as collective trusts, Defendants caused the Plan to pay millions of dollars per year in unnecessary fees.

### (4) The Performance of the JPMorgan Funds Demonstrate Its Imprudence

100.      In the first instance, Defendants should have selected the lower share classes and/or collective trust funds identified above to replace the JPMorgan mutual funds in the Plan.  Another indication that the Plan's fiduciaries failed to properly monitor the prudence of the JPMorgan mutual funds is the fact that the funds performed poorly compared to their peers and were more expensive by multiples to other comparable funds in the market.

101.      As of March 31, 2020, each of the JPMorgan SmartRetirement A funds had 5 year average returns that were worse than the majority of their peers:

| Fund | (Percent Rank in Peer Group) |
|------|------------------------------|
| JPMorgan SmartRetirement 2025 A | (75%) |
| JPMorgan SmartRetirement 2030 A | (74%) |
| JPMorgan SmartRetirement 2035 A | (87%) |
| JPMorgan SmartRetirement 2040 A | (79%) |
| JPMorgan SmartRetirement 2045 A | (86%) |
| JPMorgan SmartRetirement 2050 A | (83%) |
| JPMorgan SmartRetirement 2055 A | (86%) |

102.    Additionally, a reasonable investigation would have revealed the existence of lower-cost and better performing similar alternatives to the Plan's funds thus giving a clear indication as to the imprudence of the funds. These alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial. The alternative funds listed below also had better performances than the Plan's funds in their 3 and 5 year average returns as of June 2020.

103.    The chart below uses 2020 expense ratios as a methodology to demonstrate how much more expensive the Plan's funds were than their alternative fund counterparts.

| 2018 Fund | ER | Passive/Active Lower Cost Alternative | ER | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 A | 0.85 % | Fidelity Freedom Index 2025 Investor | 0.12 % | Target-date | 608% |
| | | American Funds 2025 Trgt Date Retire R6 | 0.33 % | | 158% |
| | | | | | |
| JPMorgan SmartRetirement 2020 A | 0.81 % | Fidelity Freedom Index 2020 Investor | 0.12 % | Target-date | 575% |
| | | American Funds 2020 Trgt Date Retire R6 | 0.31 % | | 161% |
| | | | | | |
| JPMorgan SmartRetirement 2035 A | 0.87 % | Fidelity Freedom Index 2035 Investor | 0.12 % | Target-date | 625% |
| | | American Funds 2035 Trgt Date Retire R6 | 0.37 % | | 135% |
| | | | | | |
| JPMorgan SmartRetirement 2030 A | 0.86 % | Fidelity Freedom Index 2030 Investor | 0.12 % | Target-date | 616% |
| | | American Funds 2030 Trgt Date Retire R6 | 0.35 % | | 145% |
| | | | | | |
| JPMorgan SmartRetirement 2040 A | 0.88 % | Fidelity Freedom Index 2040 Investor | 0.12 % | Target-date | 633% |

| 2018 Fund | ER | Passive/Active Lower Cost Alternative | ER | Investment Style | % Fee Excess |
|---|---|---|---|---|---|
| | | American Funds 2040 Trgt Date Retire R6 | 0.38 % | | 132% |
| | | | | | |
| JPMorgan SmartRetirement 2045 A | 0.88 % | Fidelity Freedom Index 2045 Investor | 0.12 % | Target-date | 633% |
| | | American Funds 2045 Trgt Date Retire R6 | 0.38 % | | 132% |
| | | | | | |
| JPMorgan SmartRetirement 2050 A | 0.88 % | Fidelity Freedom Index 2050 Investor | 0.12 % | Target-date | 633% |
| | | American Funds 2050 Trgt Date Retire R6 | 0.39 % | | 126% |
| | | | | | |
| JPMorgan SmartRetirement 2055 A | 0.88 % | Fidelity Freedom Index 2055 Investor | 0.12 % | Target-date | 633% |
| | | American Funds 2055 Trgt Date Retire R6 | 0.40 % | | 120% |
| | | | | | |
| JPMorgan SmartRetirement Income A | 0.73 % | Fidelity Freedom Index Income Investor | 0.12 % | Target-date | 508% |
| | | | | | |

104.    The significant fee disparities detailed above existed for all years of the Class Period.  In sum, the JPMorgan fund expense ratios were multiples of what they should have been, given the bargaining power available to the Plan fiduciaries.

### (5) The Plan's Recordkeeping and Administrative Costs Were Excessive During the Class Period

105.    Another result of Defendants' imprudent process was the excessive recordkeeping and administrative fees Plan participants were required to pay during the Class Period.

106.   Long-standing DOL guidance explicitly states that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting … service providers" and "monitor … service providers once selected to see that they continue to be appropriate choices." *See,* "*A Look at 401(k) Plan Fees,*" *supra*, at n.3.

107.   The Restatement of Trusts also puts cost-conscious management above all else while administering a retirement plan. *Tibble*, 843 F.3d at 1197-98.

108.   The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."  Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services.  These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, QDRO[14] processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services.   Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly.  Many of these services can be provided by recordkeepers at very little cost.  In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

109.   The Plan's recordkeeper during the Class Period was Alerus.  2014 through 2018 Form 5500s filed with the United States Department of Labor ("2014-2018 Form 5500s) at 3.

110.   The cost of providing recordkeeping services depends on the number of participants in a plan.  Plans with large numbers of participants can take advantage of economies of scale by

---

[14] Qualified Domestic Relations Order.

negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

111.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

112.    Although utilizing a revenue sharing approach is not *per se* imprudent, unchecked, it could be devastating for Plan participants.  "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for.  It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).  In some cases, employers and employees believe the plan is 'free' when it is in fact expensive."  Justin Pritchard, "Revenue Sharing and Invisible Fees" available at  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

113.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

114.    In 2019, the Plan's fiduciaries recognized at a Committee meeting that fees charged by "Alerus is still a little high compared to the median" but failed to take any meaningful action.

115.    Throughout the Class Period, Alerus purportedly charged a flat 0.115% of total plan assets annually which is assessed against participants on a pro rata basis. *See,* Altru Health System Retirement Plans Review of Plan Fees as of September 30, 2019 ("Fee Disclosure") at 1. As described in the Fee Disclosure: "Your account is charged a pro rata share (your account value/total plan value) of the Alerus recordkeeping fee, which is an annual Asset Based Fee of 15.5 basis points. (0.155%)." Fee Disclosure at 1.

116.    As will be discussed in more detail below, Alerus collected revenue sharing on top of this 0.155% fee. However, looking at what the 0.155% fee amounted to on a per participant basis, it's clear the fee itself is excessive. The chart below analyzes the recordkeeping fee from 2014 to 2018 as follows:

|      | ASSETS | | Assets x 0.155% | Participants | Per Participant Cost |
|------|--------|--------|-----------------|--------------|----------------------|
| 2014 | $235,356,286.00 | *0.155%* | $364,802.24 | 3074 | $118.67 |
| 2015 | $230,452,168.00 | *0.155%* | $357,200.86 | 3097 | $115.34 |
| 2016 | $242,617,728.00 | *0.155%* | $376,057.48 | 3444 | $109.19 |
| 2017 | $358,837,767.00 | *0.155%* | $556,198.54 | 4417 | $125.92 |
| 2018 | $329,411,143.00 | *0.155%* | $510,587.27 | 4359 | $117.13 |

117.    Defendants have wholly failed to prudently manage and control the Plan's recordkeeping and administrative costs by failing to try to obtain lower recordkeeping costs than Alerus was charging.

118.    By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.  One data source, the *401k Averages Book* (20th ed.

2020)[15] studies Plan fees for smaller plans, those under $200 million in assets.  Although it studies slightly smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping.  That is because recordkeeping and administrative fees should *decrease* as a Plan increases in size.  For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and administration cost (through direct compensation) of $5 per participant.  *Id*., at p. 108.  Thus, the Plan, with over $300 million dollars in assets and over 4,000  participants, should have had direct recordkeeping costs below the $5 average, which it clearly did not.

119.    The Plan's total recordkeeping costs (both direct and indirect compensation) are clearly unreasonable as some authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every day.[16]

120.    It's no excuse that some revenue sharing may have been credited back to participant accounts to help defray the excessive amount of recordkeeping and administrative fees charged by Alerus. The better and more prudent practice would have been to select funds in the Plan that didn't pay revenue sharing and then to negotiate a reasonable fee for recordkeeping. This

---

[15] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information."  *401k Averages Book* at p. 2.

[16] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

would have allowed more money to remain in each participants retirement account to their benefit. Instead, the Defendants allowed Alerus to favor its own interests over plan participants.

121.    To make matters worse, at the same time, Alerus collected revenue sharing above the 0.115% recordkeeping charge which Alerus apparently used to pay itself even more unreasonable fees.

122.    A review of some of the account statements of Plan participants show that only a portion of revenue sharing collected was credited back to participant accounts. The remainder likely ended up in the coffers of Alerus who already collected an excessive 0.155% fee from total assets in the Plan.

123.    Looking at one participant account shows that this participant had all of his or her money invested in the JPMorgan SmartRetirement 2040 fund. She was rebated approximately $267 annually which represented a credit of .022%. However, the JPMorgan SmartRetirement 2040 fund charges .50% in revenue sharing. This leaves .028% unaccounted for which likely ended up in the accounts of Alerus instead of in this participant's account. Similar arrangements are seen in other participant account statements. Had the Defendants chosen a fund which doesn't pay excessive revenue sharing and negotiated a reasonable recordkeeping fee, the Plan would have saved millions which would have ended up in participants accounts as opposed to those of Alerus.

124.    The manner in which recordkeeping costs were paid for by the Plan's fiduciaries was clearly imprudent and disloyal to the Plan participants.  The excess amount of money taken from revenue sharing that was never used to pay for recordkeeping and administrative costs cannot justify Defendants' selection of high-priced investment options to take advantage of revenue sharing.  Again, a more prudent arrangement in this case would have been to select available lower cost investment funds that used little to no revenue sharing and for the Defendants to negotiate

and/or obtain reasonable direct compensation per participant recordkeeping/administration costs with no strings attached.

125.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

126.    A prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars per year and constituted a breach of the duty of prudence.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted against the Committee)

127.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

128.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

129.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

130.    The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants.  Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.  The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.  In addition, the Prudence Defendants failed to investigate collective trusts as alternatives to mutual funds, even though they generally provide the same investment management services at a lower cost.  Likewise, the Prudence Defendants failed to monitor or control the grossly-excessive compensation paid for recordkeeping services.

131.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

132.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

133.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the

circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Altru)**

134.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

135.    Altru (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

136.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

137.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

138.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the

37

Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

(b)     failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost collective trust vehicles; and

(c)     failing to remove Committee members whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

139.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

140.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.  A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.  An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.  An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.  Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.


Dated: January 19, 2021      By:   *s/ Mark K. Gyandoh*
              Mark K. Gyandoh
              (admitted *pro hac vice*)
              Gabrielle Kelerchian
              (*pro hac vice to be requested*)
              **CAPOZZI ADLER, P.C.**
              312 Old Lancaster Road
              Merion Station, PA 19066
              Telephone: (610) 890-0200
              Facsimile: (717) 233-4103
              Email: markg@capozziadler.com
                    gabriellek@capozziadler.com

              Donald R. Reavey
              (admitted *Pro hac vice*
              **CAPOZZI ADLER, P.C.**
              2933 North Front Street
              Harrisburg, PA 17110
              Telephone: (717) 233-4101
              Facsimile: (717) 233-4103
              Email: donr@capozziadler.com

              Counsel for Plaintiffs and the Putative Class

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2021 a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:  /s/ *Mark K. Gyandoh*
Mark K. Gyandoh, Esq.